In the

# United States Court of Appeals
## For the Seventh Circuit

No. 12-3572

ANTHONY P. NAVARRO, et al.,

*Plaintiffs-Appellants*,

*v.*

LANGDON D. NEAL, Member of the
Board of Election Commissioners for the
City of Chicago as a Duly Constituted Electoral Board,
in his/her official capacity, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:12-cv-07535—**Matthew F. Kennelly**, *Judge.*

ARGUED FEBRUARY 27, 2013—DECIDED MAY 17, 2013

Before FLAUM, SYKES, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Under Illinois law, a candidate for the state legislature seeking placement on the general election ballot without having participated in a primary (or having replaced a candidate who did) must submit a nominating petition signed by a certain

number of eligible voters. In July 2012, the Chicago Board of Election Commissioners determined that five Republican candidates for seats in the state legislature had not collected the requisite numbers of signatures. The Board, therefore, denied their petitions to be listed on the ballot in the 2012 general election. In September—almost ten weeks later—these candidates, along with a group of their supporters in the electorate, filed suit against the members of the Board for injunctive and declaratory relief, alleging that the statutory scheme violated their constitutional rights to free speech and association under the First and Fourteenth Amendments. The district court dismissed the suit, holding that the doctrine of laches barred their claims.

Because the plaintiffs' delay in filing suit does not impact the Board members' ability to fashion prospective relief in future (post-2012) elections, we hold that the doctrine of laches does not apply to the declaratory portion of the plaintiffs' claim. On the merits of this claim, we find that the requirement that candidates seeking ballot access submit nominating petitions is reasonable and nondiscriminatory, and serves the important regulatory interests of protecting the integrity of elections from frivolous candidates and preventing voter confusion. Thus, the challenged statute does not unconstitutionally burden the candidates' and voters' expressive and associational rights. Because the plaintiffs' claim for declaratory relief cannot succeed on the merits, we affirm the district court's dismissal.

## I. BACKGROUND

Illinois ballot access law provides three ways in which candidates for the state legislature may be listed on general election ballots. First, candidates that win their party's primary election automatically appear on the general election ballot. To have their names placed on a party primary ballot, however, primary candidates for the State House or State Senate must submit a petition for nomination with the signatures of at least 500 or 1,000 qualified primary electors, respectively. 10 Ill. Comp. Stat. 5/8-8 (2011). These signatures must be collected within a 90-day period.

Second, if a candidate that won his or her party's primary drops out or dies before the general election is held, the party may nominate an alternative candidate. 10 Ill. Comp. Stat. 5/8-17 (2010). Although this replacement candidate is not required to submit a nominating petition, the original candidate—i.e., the winner of the primary election—did, as described above.

Third, if no party candidate's name was included in the consolidated primary ballot for a particular office and no person was nominated as a write-in, then statutorily defined party leaders may appoint a nominee to fill the party's slot on the general election ballot, subject to the same signature requirements that apply to candidates in primary elections. 10 Ill. Comp. Stat. 5/7-61 (2010). In other words, when a party seeks to place a candidate for State Representative or State Senator on the general election ballot without holding a primary, that candidate must submit a nominating petition containing the signa-

tures of 500 or 1,000 qualified voters, respectively. *Id.* These signatures must be collected during the 75 days following the primary date. *Id.*

In the March 2012 Republican Party primary election, no candidate names appeared on the ballot and no candidates were nominated via write-in for the offices of State Representatives and State Senator in several districts in Chicago and its environs. Thus, the only means by which candidates could run for these positions on the Republican Party line in the November 2012 general election would be by collecting 500 or 1,000 signatures in 75 days. Five individuals—who are now included among the plaintiffs in this suit—attempted to do so, submitting nominating petitions to the Chicago Board of Elections. On July 13, the Board determined that none of the five candidates had collected a sufficient number of valid signatures. Therefore, they did not qualify for placement on the general election ballot.

On September 20, these five candidates, along with a group of registered voters who supported them, filed a complaint for injunctive and declaratory relief, alleging that 10 Ill. Comp. Stat. 5/7-61 unduly restricts ballot access, thereby violating their rights under the First and Fourteenth Amendments. The Board members moved to dismiss the suit. The district court granted this motion, holding that the doctrine of laches barred the plaintiffs' claims for both injunctive and declaratory relief. Given that the upcoming general election was scheduled for November 6, the court stated that the plaintiffs' almost ten-week delay in filing suit

"created a situation in which any remedial order would throw the state's preparations for the election into turmoil." The court did not explain how the plaintiffs' delay in filing suit could affect their requested declaratory relief concerning future elections.

Although the district court dismissed the plaintiffs' claim based on laches, the court also discussed the merits of their claim. The court first determined that the burden that the challenged statute imposed on the plaintiffs was reasonable, because it places a burden on candidates seeking placement on the general election ballot without having participated in a primary, similar to the burden that 10 Ill. Comp. Stat. 5/8-8 places on candidates that competed in a primary before advancing to the general election. The court then noted that the challenged statute serves the "important regulatory interest in limiting ballot access to candidates with substantial support in the electorate." The district court, therefore, concluded that the plaintiffs' claim also would fail on the merits.

The plaintiffs appeal the district court's order, challenging only the district court's dismissal of their claim for declaratory relief to prevent the application of the challenged statute in future elections.

## II. ANALYSIS

We review de novo the district court's decision to grant the Board members' motion to dismiss. *See Opp v. Office of State's Attorney of Cook Cty.*, 630 F.3d 616,

619 (7th Cir. 2010). All well-pleaded allegations in the plaintiffs' complaint are accepted as true, and all reasonable inferences are drawn in their favor. *Id.* We review whether the district court properly applied the doctrine of laches in granting the Board members' motion to dismiss for an abuse of discretion. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 792 (7th Cir. 2002).

### A.  The Doctrine of Laches

The plaintiffs do not dispute that the district court properly invoked the doctrine of laches to dismiss their claim for injunctive relief. Nor could they reasonably dispute this, given their almost ten-week delay in filing suit despite the imminence of the November 6 general election. Instead, they argue that laches is not a valid basis for dismissing their claim for declaratory relief.

The doctrine of laches "derive[s] from the maxim that those who sleep on their rights, lose them." *Chattanoga Mfg.*, 301 F.3d at 792. For the doctrine to apply, the Board members must show (1) lack of diligence by Navarro, and (2) prejudice to the Board. *See Cannon v. Univ. of Health Scis./The Chicago Med. Sch.*, 710 F.2d 351, 359 (7th Cir. 1983). Here, the Board members have not shown, either below or on appeal, how the plaintiffs' delay in bringing suit has prejudiced the Board in its administration of future (i.e., post-2012) elections. The Board members direct our attention to *Fulani v. Hogsett*, in which we affirmed the dismissal of an election law claim for injunctive, monetary, and declaratory relief

on laches grounds. 917 F.2d 1028 (7th Cir. 1990). This citation, however, does not substitute for an explanation for why the district court did not abuse its discretion in invoking laches in the instant case. Nor does the district court's order explain why laches should apply to the portion of the plaintiffs' claim for declaratory relief.

Abuse of discretion is a deferential standard of review, but it is not toothless. We fail to see how the plaintiffs' filing suit in September 2012 instead of in July or August of that year could prejudice the Board concerning elections to be held in future years. Moreover, neither the Board members' brief nor the district court's order sheds light on how the plaintiffs' delay in filing suit could impact a purely prospective remedy. We therefore hold that the district court abused its discretion in dismissing the plaintiffs' claim for declaratory relief based on the doctrine of laches.

## B. The Statute's Constitutionality

Ballot access laws "place burdens on . . . the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). While these rights "rank among our most precious freedoms," *id.*, they are not absolute, *Libertarian Party v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997). To assess the constitutionality of ballot access laws, we engage in a two-step inquiry.

First, we determine whether the law imposes severe or reasonable and nondiscriminatory restrictions on candidates' and voters' constitutional rights so that we can ensure application of the appropriate level of scrutiny. *See id.* Second, we must determine whether the state interest offered in support of the law is sufficiently weighty under the appropriate level of scrutiny. *See id.* For severe restrictions on voters' rights, the challenged statute must be narrowly tailored to advance a compelling state interest. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). For statutes that impose only "reasonable, nondiscriminatory restrictions," the state's "important regulatory interests are generally sufficient." *Id.*

At the first stage, the district court determined that 10 Ill. Comp. Stat. 5/7-61 imposes a reasonable and non-discriminatory burden on candidates' and voters' rights. The plaintiffs do not dispute this determination. Ballot access laws that require "the would-be candidate [to] demonstrate significant support for his candidacy by submitting thousands (or depending on the size of the electorate, tens or even hundreds of thousands) of petitions" place a reasonable, nondiscriminatory restriction on candidates' and voters' rights. *Protect Marriage Ill. v. Orr*, 463 F.3d 604, 607-08 (7th Cir. 2006). The statute at issue here requires nothing more of members of parties that do not hold primaries (here, the Republicans) than it does of members of parties that do (here, their Democratic counterparts); candidates from both types of parties typically must obtain the same number of signatures in most circumstances. Ordi-

narily, the only differences between the two groups are that the former group of candidates must collect signatures and submit nominating petitions before the general election, not the primary, and that this group has 15 fewer days to do so. (Although it is true that, where the primary winner withdraws or dies before the general election, the party-appointed replacement candidate does not have to collect signatures, the fact remains that this individual takes the place of someone who had to do so.) Thus, we agree with the district court's analysis on this point.

A reasonable, nondiscriminatory restriction on ballot access will pass muster if it serves an important regulatory interest. *See Burdick*, 504 U.S. at 434. The Supreme Court has recognized that a state's desire that elections be "run fairly and effectively" is among these important interests. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986); *see also Am. Party of Texas v. White*, 415 U.S. 767, 782 (1974) ("[T]he State's admittedly vital interests are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measureable quantum of community support." (footnote omitted)). In the instant case, the plaintiffs concede that the prevention of voter confusion is an important regulatory interest, but they dispute that the challenged statute actually serves this interest.

There is ample caselaw supporting the proposition that ballot access laws serve the important, interrelated goals of preventing voter confusion, blocking frivolous

candidates from the ballot, and otherwise protecting the integrity of elections. *See, e.g., Burdick*, 504 U.S. at 434 (accepting that a prohibition on write-in voting is connected to this objective); *Munro*, 479 U.S. 193-94 (finding that a requirement that parties receive greater than 1% of the vote in the previous election to appear on the ballot in the next election is connected to this objective); *Am. Party of Texas*, 415 U.S. at 782 n.14 (same); *Bullock v. Carter*, 405 U.S. 134, 145 (1972) (accepting that filing fees for ballot access are connected to this objective, although holding these fees to be unconstitutional on other grounds); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (stating that a requirement that parties seeking placement on the ballot have received greater than 5% of the vote in the previous election is connected to this objective). Some of this caselaw deals directly with the connection between signature requirements for ballot access, as in this case, and the state's important interest in the integrity of its elections. *See, e.g., Lee*, 463 F.3d at 769 (finding that a petition-submission requirement for ballot access is connected to this objective, but holding the law to be unconstitutional on other grounds); *Protect Marriage*, 463 F.3d at 607-08 (finding that a petition-submission requirement is connected to this objective); *Libertarian Party*, 108 F.3d at 775 (same).

The rationale behind this connection is not complicated. Light regulation of ballot access could lead to an unmanageable number of frivolous candidates qualifying for the ballot, thereby confusing voters. *See Nader v. Keith*, 385 F.3d 729, 733 (7th Cir. 2004) (discussing how Florida's need to design a ballot that could

accommodate ten presidential candidates led to voter confusion during the 2000 presidential election); Elizabeth Garrett, *Democracy in the Wake of the California Recall*, 153 Penn. L. Rev. 239, 254-55 (2004) (attributing the listing of 135 candidates on the ballot in California's 2003 gubernatorial recall election to a "badly drafted statutory scheme," in which candidates could qualify for the ballot simply by producing 65 signatures and paying $3,500).

The plaintiffs point to the fact that, since only the Democratic candidate met the statutory scheme's criteria for ballot placement in some 2012 state legislative races, ballots in the relevant districts listed only the Democratic candidate's name for these offices. The plaintiffs claim that the inclusion of only one candidate on the ballot in some races belies the proffered rationale that the challenged statute prevents voter confusion. How, the plaintiffs ask, can voters be confused if only one name is printed on the ballots?

The plaintiffs' question overlooks the possibility that relaxing or abolishing these signature requirements could attract a significant number of frivolous candidates, leading to phone book-sized ballots and widespread voter confusion.[1] Since the existing requirements that

---

[1] Modern readers may wonder what a phone book is (or was). In short, it is a compilation of information about telephone subscribers including their names, addresses, and telephone numbers. *See* "Telephone directory," *Wikipedia*,

(continued...)

candidates for State Representative collect 500 signatures and candidates for State Senator collect 1,000 do not strike us as particularly onerous,[2] it seems plausible that lowering this bar even further could open the floodgates to an unmanageable number of frivolous candidates gaining ballot access. The state need not wait for such a situation to occur in order to act. *See Munro*, 479 U.S. at 194-95 ("[The Supreme Court has] never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidates prior to the imposition of reasonable restrictions on ballot access."). If courts were to require that government defendants marshal evidence to prove actual voter confusion, such a requirement would "necessitate that a State's

---

[1] (...continued)
http://en.wikipedia.org/wiki/Telephone_directory (last visited May 14, 2013). In a large urban area like Chicago, such a directory could consist of millions of subscribers.

[2] Although the record does not include information concerning the pool of qualified voters in each district from which candidates must obtain signatures, we take notice of the facts that 2,781,182 Cook County residents were eligible to vote in the 2012 general election, and that 57 Illinois House districts and 32 Illinois Senate districts include at least a portion of Cook County. Illinois State Board of Elections, Official Vote: November 6, 2012 General Election i, 38-113 (2012). These facts provide a rough sense of the pools of qualified voters from which candidates for these two bodies must obtain 500 or 1,000 signatures, respectively.

political system sustain some level of damage before the legislature could take corrective action." *Id.* at 195. Instead, the speculative concern that altering the challenged signature requirement would lead to a large number of frivolous candidates qualifying for the ballot and, consequently, voter confusion is sufficient. To prevent such harms from occurring in the first place, the state may enact reasonable and nondiscriminatory ballot access laws that serve the important regulatory interests of preventing voter confusion and protecting the integrity of elections. We hold that 10 Ill. Comp. Stat. 5/7-61 is such a law.

### III. CONCLUSION

Because the plaintiffs' claim that 10 Ill. Comp. Stat. 5/7-61 violates their constitutional rights fails on the merits, the district court's erroneous dismissal of their claim on laches grounds was harmless. Accordingly, we AFFIRM the district court's judgment of dismissal.