In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 13-2733

JAY STONE, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BOARD OF ELECTION COMMISSIONERS
FOR THE CITY OF CHICAGO,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 10-cv-7727 — **Robert M. Dow, Jr.**, *Judge.*

———————————

ARGUED FEBRUARY 19, 2014 — DECIDED APRIL 25, 2014

———————————

Before BAUER, FLAUM, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Candidates for Chicago mayor must
submit nominating petitions signed by at least 12,500 regis-
tered voters to appear on the ballot for the general election.
In this case, we consider whether Chicago's ballot access
scheme violates rights guaranteed by the First and Four-
teenth Amendments. The district court, concluding that the

scheme was constitutional, dismissed the case for failure to state a claim. We affirm.

**I**

Under Illinois law, candidates for Chicago mayor, city treasurer, or city clerk must gather signatures from 12,500 "legal voters of the city" to have their name printed on the ballot. 65 ILCS 20/21-28(b). This figure amounts to just under 1% of the 1.3 million or so registered voters in Chicago. As a proportion of active voters, the number is somewhat higher; 12,500 is approximately 2.7% of the number of votes cast in the 2007 mayoral election and 2.1% of those cast in 2011. The precise percentages are not so important—in practice, candidates are advised to give themselves some margin for error, in case of subsequent legal challenges, *see Krislov v. Rednour*, 226 F.3d 851, 859–60 (7th Cir. 2000)—but, as we shall see, they are helpful to situate Chicago's requirement among other ballot access schemes that have been subject to constitutional challenge. Candidates have ninety days in which to gather their signatures, 10 ILCS 5/10-4, and voters may not sign more than one nominating petition for the same office in a single election cycle, 10 ILCS 5/10-3; 65 ILCS 20/21-28(c).

Chicago's most recent general election took place in February 2011. Twenty candidates submitted nominating petitions to run for mayor. *See* Eric Zorn, *My Early Line on the Mayor's Race*, Chi. Tribune (Nov. 23, 2010), http://blogs.chicagotribune.com/news_columnists_ezorn/201 0/11/earlyline.html. Among the hopefuls were four of the plaintiffs: Howard Ray, Jay Stone, William Walls, and Fredrick White. (The fifth plaintiff, Denise Denson, is a Chicago voter.) Of the four candidate-plaintiffs, however, only Walls gathered enough signatures to appear on the February

ballot. Ray, Stone, and White managed just 2625, 250, and 10,200 valid signatures, respectively, and were disqualified.[1]

The plaintiffs promptly sued to enjoin the 12,500-signature requirement and declare it unconstitutional. On January 10, 2011, the district court denied their motion for a preliminary injunction. The plaintiffs filed an interlocutory appeal, but by the time the case reached our court the February election had come and gone—Rahm Emanuel prevailed, Walls came in sixth—and we dismissed their appeal as moot. 643 F.3d 543 (7th Cir. 2011).

The lawsuit then returned to the district court, where the plaintiffs amended their complaint to encompass not just the 12,500-signature requirement itself, but also the ninety-day window for collecting signatures and the rule that a given voter cannot sign more than one candidate's petition in any election cycle. The plaintiffs claimed that these requirements "amplified" the already-heavy burden of gathering the signatures. The district court, however, concluded that their claims had been "soundly rejected by extensive Supreme Court and Seventh Circuit precedent" and on the defendant's motion dismissed the case. 955 F. Supp. 2d 886, 900 (N.D. Ill. 2013). Once again, the plaintiffs appeal.

## II

We review the legal sufficiency of the plaintiffs' complaint de novo, accepting all well-pleaded allegations as true and making the usual inferences in their favor. *Navarro v. Neal*, 716 F.3d 425, 429 (7th Cir. 2013).

---

[1] A sixth plaintiff, Frank Coconate, sought to run for city clerk in 2011; he filed only 61 signatures and was also disqualified. Coconate dropped out of the case when the plaintiffs filed their third amended complaint.

## A

It is well-settled that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights" to associate politically with likeminded voters and to cast a meaningful vote. *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983). But "not all restrictions … on candidates' eligibility for the ballot impose constitutionally-suspect burdens." *Id.* at 788. "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997).

The Supreme Court has often stated that in this area there is no "litmus-paper test" to "separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Rather, a court must make a practical assessment of the challenged scheme's justifications and effects:

> [A] court … must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the [c]ourt must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.*; *see also Navarro*, 716 F.3d at 430; *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006).

Practically speaking, much of the action takes place at the first stage of *Anderson*'s balancing inquiry. If the burden on the plaintiffs' constitutional rights is "severe," a state's regulation must be narrowly drawn to advance a compelling state interest. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). If the burden is merely "reasonable" and "nondiscriminatory," by contrast, the government's legitimate regulatory interests will generally carry the day. *Id.* Even this rule can only take us so far, though, for there is no "litmus test for measuring the severity of a burden that a state law imposes," either. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008).

**B**

With these principles in mind, we turn to Chicago's ballot access scheme. The plaintiffs argue that requiring candidates to collect 12,500 signatures in ninety days severely burdens "Average Joes" and "Janes", outsider candidates who cannot draw on an existing political infrastructure or afford to hire persons (called "circulators") to collect signatures on their behalf. They also argue that Chicago's requirements are much more onerous than those in other large cities. For example, they tell us that Los Angeles requires mayoral candidates to obtain 1000 signatures in twenty-five days—that number can be reduced to 500 if the candidate pays a $300 filing fee. Also, unlike Chicago, Los Angeles apparently allows voters to sign more than one nominating petition in a given election. *See* Los Angeles, Cal., Election Code §§ 307, 309, 310 (2012), *available at* http://cityclerk.lacity.org/election/Election_Code.pdf.

Illinois enacted its 12,500-signature requirement, now codified at 65 ILCS 20/21-28(b), in August 2005. This change appears to have been the legislature's attempt to make the electoral process more open, not less—before 2005, interested candidates had to amass twice as many signatures (25,000) to get on the ballot. *See* Findings and Decision Regarding the Nomination Papers of Jack J. McInerney ¶10.I, No. 03-EB-MUN-1 (Bd. of Election Comm'rs of City of Chi. Jan. 14, 2003), *available at* http://www.chicagoelections.com/dm/general/document_2701.pdf; Steve Neal, Editorial, *Change Unfair Petition Rules: Candidates for City Offices Need 25,000 Signatures to Run*, Chi. Sun-Times, July 29, 2002, at 25. As one of the bill's sponsors explained:

> The earlier requirement to run for Mayor of the City of Chicago, 25 thousand signatures, was almost a full percent of the populace and we thought that was too high.

> We thought that created a situation [in] which many people who might legitimately stand for that office would not be able to meet the signature requirement. And we think 12,500 gives people a much better opportunity to stand for one of those municipal offices in Chicago.

94th Ill. Gen. Assembly, House Proceedings, May 28, 2005, at 12 (statement of Rep. Currie).

Although interesting, this history is by no means dispositive; half of a severe burden can still be severe. (By the same token, the fact that Los Angeles has chosen an arguably more lenient approach to ballot qualification says little about the burden imposed by Chicago's scheme.) What is ultimately

important is not the absolute or relative number of signatures required but whether a "reasonably diligent candidate could be expected to be able to meet the requirements and gain a place on the ballot." *Bowe v. Bd. of Election Comm'rs of City of Chi.*, 614 F.2d 1147, 1152 (7th Cir. 1980) (citing *Storer*, 415 U.S. at 742). Like the district court, we find that the answer to that question is yes.

"[B]allot access history is an important factor in determining whether restrictions impermissibly burden the freedom of political association." *Lee*, 463 F.3d at 769. So it is instructive that, since 2005, a good number of candidates have been able to satisfy Chicago's ballot requirements. In fact, nine mayoral candidates successfully obtained 12,500 valid signatures for the February 2011 election, although three of them dropped out before election day. Even six candidates is a healthy field; Chicagoans had not had so many choices at the polls since at least 1975.[2]

We note too that one of the nine mayoral candidates who qualified for the municipal general election in 2011, William Walls, is a plaintiff in this case. Walls appeared on the ballot in February and received 5343 votes. He now represents that complying with the signature requirement, though achievable, was "onerous and restrictive." But like the Supreme Court in *American Party of Texas v. White*, we are skeptical of claims that ballot access laws "are too onerous … where

---

[2] Three mayoral candidates appeared on the general election ballot in 2007, four in 2003, two in 1999, four in 1995, and four in 1991. Interested readers can find information about city elections dating back to 1975 by visiting the Chicago Democracy Project, www.chicagodemocracy.org/ChooseElection.jsp (last visited Apr. 24, 2014).

[one] of the original party plaintiffs" himself "satisfied these requirements." 415 U.S. 767, 787 (1974).

In short, the fact that nine candidates satisfied 65 ILCS 20/21-28(b) is powerful evidence that the burden of gathering 12,500 signatures in ninety days is not severe. Compare *Lee v. Keith*, where we struck down a signature requirement for the Illinois legislature that not a single independent candidate had been able to satisfy in twenty-five years. 463 F.3d at 765. The present case is more like *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 775 (7th Cir. 1997), in which "two third-party candidates … gained access to the 1994 Illinois general election ballot" under the challenged ballot laws, leading us to conclude that "the requirements d[id] not pose an insurmountable obstacle to the [petitioner's] access."

A twist which might be thought to differentiate our case from *Lee* or *Rednour*—or, for that matter, from the Illinois ballot access schemes previously considered by the Supreme Court, *see Norman v. Reed*, 502 U.S. 279 (1992); *Illinois Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979); *Jackson v. Ogilvie*, 325 F. Supp. 864 (N.D. Ill.), *aff'd* 403 U.S. 925 (1971); *Moore v. Ogilvie*, 394 U.S. 814 (1969)—is that Chicago's mayoral elections are, by statute, nonpartisan. *See* 65 ILCS 20/21-5(a). This means that *every* office seeker, not just independent or third-party candidates, must meet the same signature requirement in the same time frame and from the same pool of voters.

One might therefore understand the nominating process for Chicago mayor as roughly analogous to a nonpartisan "blanket primary." In a blanket primary, "the State determines what qualifications it requires for a candidate to have a place on the primary ballot …. Each voter … may then vote

for any candidate, and the top two vote getters (or however many the state prescribes) then move on to the general election." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 585–86 (2000). Effectively, what Illinois has chosen to do in Chicago is permit any mayoral contender to take part in a ninety-day version of a blanket primary, and further prescribed that only those who receive 12,500 "votes"—that is, signatures—in the process can advance to the general election. *Cf. Munro v. Socialist Workers Party*, 479 U.S. 189 (1986) (approving of Washington's requirement that a minor-party candidate receive at least 1% of the vote in a blanket primary in order to qualify for the ballot). As compared to a traditional party-primary system, Chicago's ballot access scheme could even be seen as equalizing the burden between entrenched candidates and outsiders, who now stand on the same footing for ballot qualification purposes.

There is no need to pursue this analogy too far, however. Chicago's signature requirement is not a severe burden under a traditional framework. Recall that 12,500 signatures is about 1% of the total number of registered voters in Chicago or (depending on turnout) about 2.5% of the votes cast in the last mayoral election. The Supreme Court has approved of signature requirements as high as 5% of the eligible voting base. *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Indeed, the Court later approved of an Illinois requirement that minor-party candidates in the Cook County suburbs obtain 25,000 signatures to qualify for the ballot. 25,000 corresponded to "only slightly more than 2%" of suburban voters," which the Court observed was "a considerably more lenient restriction than the [5% requirement] we upheld in *Jenness*." *Norman*, 502 U.S. at 295.

In light of cases like *Jenness* and *Norman*, we have said that plaintiffs "cannot argue that" even a "5% petitioning requirement is severe on its face." *Rednour*, 108 F.3d at 775; *see also Lee*, 463 F.3d at 771 (observing that *Jenness* sets something of an "outer limit" for signature requirements). And the two other challenged features of Chicago's scheme—the ninety-day collection period and the one-voter, one-signature rule—do not transform an otherwise reasonable 1% signature requirement into a severe one.

Ninety days does not strike us as an excessively short time to collect 12,500 signatures, particularly when this schedule applies equally to every candidate. We previously saw no problem with a ninety-day window to collect 25,000 signatures. *Nader v. Keith*, 385 F.3d 729, 736 (7th Cir. 2004). The Supreme Court has approved of a shorter period to collect a similar number. *White*, 415 U.S. at 786–87 (fifty-five days and 22,000 signatures). The law the Court upheld in *Jenness* gave candidates twice as long to circulate petitions (180 days) as Chicago does here, but the signature requirement (5% of eligible voters) was proportionally about five times greater than Chicago's. 403 U.S. at 433–434. And at perhaps the furthest extreme, the Court has said that "gathering 325,000 signatures in 24 days would not appear to be an impossible burden," at least so long as the pool of eligible voters was large enough that the required percentage of signatures was not more than 5%. *Storer*, 415 U.S. at 740.

Nor do we believe that the one-voter, one-signature rule acts as a "suffocating restriction[] … upon the free circulation of nominating petitions." *Jenness*, 403 U.S. at 438. True, a type of one-signature rule caused us some concern in *Lee v. Keith*, but for reasons that do not apply here. *Lee* involved a

requirement that independent candidates for the Illinois legislature collect signatures equal in amount to 10% of the votes cast in the last election. The petitions were due ninety-two days before the party primaries. Anyone who signed an independent's petition, however, was disqualified from voting in the primaries. 463 F.3d at 765. We concluded that "[o]nly the most committed supporters of an independent candidate would be willing to sign on condition of primary disenfranchisement, especially so early in the political season." *Id.* at 771.

The choice Chicago voters face is not nearly so fraught. The city's nomination scheme applies across the board, not just to independents; every candidate files his or her nominating petition at the same point in the election cycle. As a result, a voter who signs her preferred candidate's petition is not disadvantaged in any other aspect of the electoral process; she simply participates in nominating candidates on par with all eligible voters. In this context, the one-voter, one-signature rule is "nothing more than a prohibition against any elector's casting more than one vote in the process of nominating candidates for a particular office." *White*, 415 U.S. at 785; *cf. Storer*, 415 U.S. at 741 ("[A] State may confine each voter to one vote in one primary election.").

Again, nine mayoral candidates, including one of the plaintiffs, successfully qualified for the ballot in the 2011 election—far more than we would expect from an electoral system designed to "freeze the political status quo." *Jenness*, 403 U.S. at 438. And Chicago's signature requirement, even if it is stricter than other large cities' approaches, fits comfortably within the range of schemes that our court and the Supreme Court have previously held to be constitutional.

While it can be "difficult to rely heavily on precedent in evaluating [ballot] restrictions, because there is great variance among the states' schemes," *Nader*, 385 F.3d at 735, here both case law and common sense point in the same direction. We therefore hold that Chicago's ballot access rules for mayoral candidates impose only "reasonable, nondiscriminatory restrictions" on voters' and candidates' constitutional rights. *Burdick*, 504 U.S. at 434.

From this point, our conclusion that Chicago's scheme is constitutional quickly follows. There is no question that the 12,500-signature requirement and accompanying rules "serve the important, interrelated goals of preventing voter confusion, blocking frivolous candidates from the ballot, and otherwise protecting the integrity of elections." *Navarro*, 716 F.3d at 431; *see also Anderson*, 460 U.S. at 788 n.9 ("The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot."). The plaintiffs complain that there is no evidence that a more crowded ballot would in fact cause voter confusion, but on this point the Supreme Court has been clear: legislatures do not need to make "a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." *Munro*, 479 U.S. at 194–95. Even a "speculative concern that altering the challenged signature requirement would lead to a large number of frivolous candidates … and, consequently, voter confusion is sufficient." *Navarro*, 716 F.3d at 432.

In *Protect Marriage Illinois v. Orr*, 463 F.3d 604 (7th Cir. 2006), we said that:

A state is not required to list everyone who wants to stand for office.… It can impose reasonable restrictions on access, as by requiring … that the would-be candidate demonstrate significant support for his candidacy by submitting thousands (or, depending on the size of the electorate, tens or even hundreds of thousands) of petitions in order to prevent the voter confusion that would be engendered by too long a ballot."

*Id.* at 607–08. Illinois has chosen to require just that for the office of Chicago mayor. The state's approach undoubtedly places some burden on candidates and their supporters, who must work to gather the necessary signatures. But the scheme leaves room for reasonably diligent candidates to get on the ballot even as it directly furthers the state's legitimate interests in avoiding ballot overcrowding and preventing voter confusion. These interests are strong enough to justify the reasonable, nondiscriminatory burden on the plaintiffs' First and Fourteenth Amendment rights.

## C

At oral argument, the plaintiffs placed a great deal of weight on *Mandel v. Bradley*, 432 U.S. 173 (1977) (per curiam), although they failed to cite it in their opening brief (they did not file a reply). That case involved a constitutional challenge to Maryland's ballot access rules for independents. The three-judge district court had felt bound by an earlier case, *Tucker v. Salera*, 424 U.S. 959 (1976), in which the Supreme Court summarily affirmed a lower-court decision striking down Pennsylvania's ballot access scheme solely because the scheme required independents to submit signatures far in advance of the general election. 432 U.S. at 175. The district

court in *Mandel* believed that *Salera* obligated it to strike down Maryland's law, which contained a similar early-filing deadline. *Id.* But the Supreme Court emphasized that "a summary affirmance is an affirmance of the judgment only," so that *Salera*'s rationale could "not be gleaned solely from the opinion below." *Id.* at 176. Furthermore, it noted that Maryland's scheme was distinguishable from Pennsylvania's because Maryland gave candidates a longer period to gather signatures. *Id.* at 177. Accordingly, the Court returned the case to the district court so it could "undertake an independent examination of the merits." *Id.*

The plaintiffs also directed our attention to an unpublished case in which the Eleventh Circuit reversed the district court for reasoning, in effect, that "if a 5% [signature] requirement was constitutional, [Georgia's] lower 1% requirement must also be constitutional." *Green Party of Ga. v. Georgia,* No. 13-11816, 2014 WL 30742, at *1 (11th Cir. Jan. 6, 2014) (per curiam). This analysis, the court noted, employed just the "type of 'litmus-paper test' the Supreme Court rejected in *Anderson* [*v. Celebrezze*]." *Id.* at *2 (quoting 460 U.S. at 789).

Neither of these cases is relevant here. If the district court had dismissed this case merely because other, more numerous signature requirements than Chicago's had previously been held constitutional, or if it had relied largely on reasoning "gleaned" from summary affirmances, we might agree that reversal would be appropriate. But that is not what happened at all. The district court applied *Anderson v. Celebrezze*'s balancing test (the same test the Supreme Court in *Mandel* and the Eleventh Circuit in *Green Party of Georgia* ordered the district court to apply on remand), duly balanced

the burden on voters' rights against the state's interests, and determined—correctly—that the plaintiffs had not stated a plausible claim for relief. As in *Gjersten v. Board of Election Commissioners*, we are confident that the district court "applied no 'litmus-paper test.'" 791 F.2d 472, 477 (7th Cir. 1986).

Also at oral argument, plaintiffs' counsel stressed that, because this case was dismissed at such an early stage, judgments about what might or might not be burdensome are premature. He urged us to send the case back to the district court, so his clients could build a record on the signature requirement's severity. Yet there is nothing remarkable about granting a motion to dismiss in an election-law case if careful consideration of the complaint shows that the plaintiff has not stated a claim. *See, e.g.*, *Navarro*, 716 F.3d at 425; *Libertarian Party of N.D. v. Jaeger*, 659 F.3d 687 (8th Cir. 2011); *Lawrence v. Blackwell*, 430 F.3d 368 (6th Cir. 2005); *Rubin v. City of Santa Monica*, 308 F.3d 1008 (9th Cir. 2002); *Wit v. Berman*, 306 F.3d 1256 (2d Cir. 2002). Having determined that Chicago's ballot access scheme is constitutional, there is no need to remand the case for further proceedings.

\*       \*       \*

The judgment of the district court is

AFFIRMED.