In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-2756

INDIANA GREEN PARTY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

DIEGO MORALES,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:22-cv-00518 — **James R. Sweeney II**, *Judge.*

———————————

ARGUED APRIL 10, 2024 — DECIDED AUGUST 19, 2024

———————————

Before RIPPLE, HAMILTON, and BRENNAN, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Like most states, Indiana has long required candidates seeking a place on its general election ballot to first demonstrate a significant modicum of support among registered voters. A candidate can make such a demonstration by obtaining signatures numbering at least 2 percent of the total votes cast in their election district in the last election for the position of Secretary of State of Indiana. Alternatively,

a candidate can obtain the nomination of a party that gar-nered 2 percent of the votes cast in that election.

This case presents a challenge, under the First and Four-teenth Amendments, to the constitutionality of that legislative scheme. The plaintiffs contend that the number of signatures required for candidates seeking access by petition is too high, that the process for submitting petitions is too burdensome, and that the deadline for submitting petitions is too early. They also challenge Indiana law's indexing of its party-level access option to the results of the most recent Secretary of State election.

The district court granted summary judgment to the de-fendant, Indiana's Secretary of State. We now affirm the judg-ment of the district court. States have broad authority to im-pose reasonable, nondiscriminatory restrictions on access to the ballot. The restrictions challenged here easily pass the scrutiny that the Supreme Court and this court have em-ployed in similar cases.

## I

## BACKGROUND

### A.

A candidate for elected office who desires to have his or her name printed on Indiana's general election ballot has two options. First, the candidate can gain access by petition. Ind. Code § 3-8-6-2. To do so, the candidate must collect, from reg-istered voters in the election district the candidate seeks to represent, signatures numbering 2 percent of the votes cast in the last Secretary of State election in that election district. Ind. Code § 3-8-6-3. A candidate seeking a statewide office in 2024, for instance, must collect 36,943 signatures, which is the

number of signatures equal to 2 percent of the votes cast in the relevant election district (the state) in the 2022 election for Secretary of State. There is no requirement that signatures be distributed geographically; candidates can collect signatures from anywhere in the relevant election district. The voters must sign the petitions by hand, but the signatures need not be notarized. Ind. Code § 3-8-6-6(b).

Candidates can begin collecting signatures once Indiana's Election Division has published the petition forms for the relevant election. The Election Division typically publishes these forms well in advance of the general election; for the 2024 election, it published them in the summer of 2023. Once candidates have collected the required signatures, they must obtain a certification from the voter registration office of the counties whose voters signed their petitions. Ind. Code § 3-8-6-10. The county's voter registration office certifies whether each of the individuals listed on the petitions is registered to vote at the address provided. Ind. Code § 3-8-6-8. Candidates have until June 30 of the election year to submit signed petitions to the counties for certification. Ind. Code § 3-8-6-10(b). After county-level certification is complete, the petitions are forwarded to the Election Division. Ind. Code §§ 3-8-6-8, -10(c), -10(e).

We considered the constitutionality of this petitioning process in *Hall v. Simcox*, 766 F.2d 1171 (7th Cir. 1985). The plaintiffs in that case, the Communist Party and some of its candidates and voters, sued shortly after Indiana increased its signature requirement from 0.5 percent to 2 percent in 1980. They focused their challenge on the newly enacted 2 percent signature requirement, rather than on the county-level submission requirement or the deadline for submitting petitions.

We upheld the 2 percent signature requirement on account of the "abundant judicial authority … for allowing states to set even higher minimum percentages than Indiana has done." *Id.* at 1173.

The other way for a candidate to obtain a place on the general election ballot is to obtain the nomination of a party that is entitled to place its full slate of candidates on the general election ballot. A party has this level of ballot access (hereinafter, "full slate access") if its candidate garnered at least 2 percent of the votes cast in the most recent election for Secretary of State of Indiana. Ind. Code § 3-10-2-15. The Republican and Democratic Parties have had full slate access in all recent election cycles, and the Libertarian Party of Indiana has had full slate access in all election cycles since 1994. Further, if a party's candidate in the most recent election for Secretary of State of Indiana received at least 10 percent of the votes cast in that election, then Indiana funds its primary elections. Ind. Code § 3-10-1-2. In all recent election cycles, the Republican and Democratic Parties have obtained this level of support and have therefore had state-funded primary elections.

If an individual does not get on the ballot through either of these paths, the individual can become a write-in candidate by filing a timely declaration of intent with the Election Division. Ind. Code §§ 3-8-2-2.5, 3-8-7-30(a).[1]

---

[1] Indiana added this write-in option shortly after a federal district court held that Indiana's ban on write-in voting violated the First and Fourteenth Amendments. *See Paul v. State of Indiana Election Bd.*, 743 F. Supp. 616, 626 (S.D. Ind. 1990); Ind. Pub. L. 4-1991, § 6.

**B.**

The plaintiffs in the present case are the Indiana Green Party, the Libertarian Party of Indiana, and candidates and other individuals associated or formerly associated with those parties. They brought this action against the Secretary of State of Indiana in the United States District Court for the Southern District of Indiana. They assert claims under the First Amendment, as incorporated against the states by the Fourteenth Amendment,[2] as well as under the Fourteenth Amendment's Equal Protection Clause.

After discovery, the parties filed cross-motions for summary judgment. The plaintiffs submitted declarations from seventeen individuals in support of their summary judgment motion. These individuals include a former Indiana state legislator, a political science professor, the current chairpersons of the Indiana Green Party and the Libertarian Party of Indiana, individuals affiliated with several independent and third-party presidential candidacies, and other individuals familiar with Indiana's ballot access requirements.

The district court granted summary judgment to the defendant, Indiana's Secretary of State. In its opinion explaining that decision, the district court addressed some, but not all, of the plaintiffs' arguments. It concluded that, given Supreme Court and Seventh Circuit precedent, requiring the signatures of 2 percent of the electorate was constitutionally permissible. It further concluded that the June 30 filing deadline for submitting signatures to the counties was also permissible, given the Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431, 433–34, 438 (1971), which involved an earlier filing

---

[2] *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

deadline. The district court did not address the burdens created by, or the interests served by, Indiana's county-level submission requirement. It also did not address the plaintiffs' challenge to Indiana's indexing of the full slate access option to the results of the most recent Secretary of State election.

The plaintiffs appealed.

## II

## DISCUSSION

We review a district court's grant of summary judgment de novo. *Hero v. Lake Cnty. Election Bd.*, 42 F.4th 768, 771 (7th Cir. 2022). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, both parties filed cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion was granted." *Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020).

## A.

"It is well-settled that '[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights' to associate politically with like-minded voters and to cast a meaningful vote." *Stone v. Bd. of Election Comm'rs for City of Chicago*, 750 F.3d 678, 681 (7th Cir. 2014) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983)). "[T]he constitutional right of citizens to create and develop new political parties … derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Norman v. Reed*, 502 U.S. 279, 288 (1992). Thus,

"[r]estrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

"These rights, however, are not absolute." *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 773 (7th Cir. 1997). "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). Indeed, our Constitution expressly "grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,'" and this "power is matched by state control over the election process for state offices." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) (quoting U.S. Const. art. I, § 4, cl. 1).

In evaluating restrictions on access to the ballot, we employ a fact-intensive balancing test articulated by the Court in *Anderson*, and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992). Under that test,

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which

> those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson*, 460 U.S. at 789. If the challenged provisions impose "only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). But if the challenged scheme imposes a "severe" burden on First and Fourteenth Amendment rights, the regulations are subject to strict scrutiny and may only survive if "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (quoting *Norman*, 502 U.S. at 289).

Because this test requires a "practical assessment of the challenged scheme's justifications and effects," we must consider the specific facts of the case to determine the extent of the burdens imposed and the weight of the State's asserted interests. *Stone*, 750 F.3d at 681; *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008); *Gill*, 962 F.3d at 364–65. Further, in weighing the burdens against the State's interests, each avenue to ballot access "must be considered in its entirety." *Tripp v. Scholz*, 872 F.3d 857, 870 (7th Cir. 2017) (quoting *Hall*, 766 F.2d at 1174).

**B.**

We now turn to the application of the *Anderson-Burdick* test to the Indiana statutory scheme that is before us. We start with the plaintiffs' challenge to the petitioning process. The

plaintiffs focus their challenge on the quantity of signatures required, the requirement that candidates submit signatures to counties for certification, and the June 30 deadline for submitting signatures. We conclude that these requirements for candidates seeking access by petition cannot be fairly characterized as imposing severe burdens. These requirements, moreover, are justified by sufficiently weighty state interests.

### 1.

The percentage of signatures required (2 percent) certainly does not itself impose a severe burden. As we said in *Hall*, "there is abundant judicial authority, much in the Supreme Court itself and therefore beyond our power to reexamine, for allowing states to set even higher minimum percentages than Indiana has done." *Hall*, 766 F.2d at 1173; *see Jenness*, 403 U.S. at 438 (5 percent); *Cowen v. Sec'y of State of Georgia*, 22 F.4th 1227, 1234 (11th Cir. 2022) (5 percent); *Tripp*, 872 F.3d at 869 (5 percent); *Libertarian Party of Illinois*, 108 F.3d at 773, 777 (5 percent); *Arutunoff v. Oklahoma State Election Bd.*, 687 F.2d 1375, 1380 (10th Cir. 1982) (5 percent); *Beller v. Kirk*, 328 F. Supp. 485, 486 (S.D. Fla. 1970), *aff'd without opinion sub nom. Beller v. Askew*, 403 U.S. 925 (1971) (3 percent).[3] Further, in many of these cases, the required percentage was applied to a broader base than it is here. In *Jenness* and *Cowen*, the base was all registered voters. 403 U.S. at 433; 22 F.4th at 1230. Because many registered voters do not actually vote, this is a larger group than actual voters, the base here. In *Arutunoff*, the base

---

[3] *See also American Party of Texas v. White*, 415 U.S. 767, 789 (1974) ("Demanding signatures equal in number to 3% to 5% of the vote … is not invalid on its face … ."); *Storer v. Brown*, 415 U.S. 724, 738 (1974) (stating that requiring signatures numbering 5 percent of the electorate is not, by itself, "excessive").

in some election years was the vote for President, 687 F.3d at 1379, which tends to be larger than the vote in "off-year" elections in which there is no candidate for President.

The timeframe within which candidates can collect signatures is also not severely burdensome. Candidates can begin collecting signatures as soon as the Election Division publishes the petition forms. For the 2024 election, publication occurred in the summer of 2023, permitting candidates a far earlier start than in other cases in which the timeline for collecting petitions was upheld. *See Jenness*, 403 U.S. at 433–34 (mid-December start); *Libertarian Party of New Hampshire v. Gardner*, 843 F.3d 20, 30 (1st Cir. 2016) (January 1 start). Candidates then have until June 30 of the election year to submit their petitions to the relevant counties. This June 30 deadline is far later than deadlines the Supreme Court and this court have deemed to be too early. *See Anderson*, 460 U.S. at 782, 805–06 (mid-March); *Lee v. Keith*, 463 F.3d 763, 768 (7th Cir. 2006) (mid-December). It also falls well after the major parties' primary elections (which are usually in early May), thus giving independent candidates or minor parties disappointed with a major party's selections an opportunity to mount a petition drive.[4]

The requirement that candidates submit petitions to each county's voter registration office is also not unduly burdensome. This procedure does require additional time and effort on the part of petition circulators, both on the front end (while

---

[4] *Cf. Graveline v. Benson*, 992 F.3d 524, 537 (6th Cir. 2021) (collecting cases in which courts struck down laws requiring independent candidates or minor parties to file qualifying petitions well in advance of the state's primary elections).

collecting signatures) and on the back end (when submitting them to the counties for certification). This requirement, however, is not any more burdensome than notarization requirements that have been upheld in prior cases. In *Tripp v. Scholz*, for example, we upheld a requirement that each petition sheet contain a notarized affidavit certifying the authenticity of the signatures on the sheet. We concluded that, although the notarization requirement "certainly impose[d] some logistical burden on plaintiffs' ballot access rights, it cannot be fairly characterized as 'severe.'" 872 F.3d at 869. Like the notarization requirement in *Tripp*, the county-level submission procedure does add "'an extra step' to the nomination process requiring 'additional time and effort,'" *id.* at 867, but the burden it imposes is not severe.

The plaintiffs emphasize the time and expense of complying with Indiana's petitioning requirements. They note evidence they submitted in the district court regarding the costs of using paid staff or professional petitioning firms to collect signatures, and they state that keeping volunteers engaged in signature collection is difficult. The Supreme Court considered a similar argument in *American Party of Texas v. White*, 415 U.S. 767 (1974). The Court noted that the minor parties in that case "must undergo expense, to be sure, in holding their conventions and accumulating the necessary signatures to qualify for the ballot." *Id.* at 793–94. But it declined to conclude that such expenses rendered Texas's otherwise reasonable ballot access requirements unduly burdensome. The Court also stated in its opinion that "[h]ard work and sacrifice of dedicated volunteers are the lifeblood of any political organization." *Id.* at 787. Given *American Party of Texas*, the potential expense of paying staff or professional circulators to

collect signatures does not render Indiana's otherwise eminently reasonable requirements severely burdensome.

The experience of candidates seeking ballot access by petition in Indiana further indicates that these petitioning requirements are not severely burdensome. *See Storer v. Brown*, 415 U.S. 724, 742 (1974) (noting that "[p]ast experience [is] a helpful … guide" in evaluating ballot access restrictions). There have been nine successful statewide petition drives in Indiana since the 2 percent signature requirement was enacted. The Libertarian Party of Indiana conducted two of those drives in 1992 and 1994, and it has maintained full slate access since 1994. Other candidates have also completed petition drives in races other than statewide races.[5] To be sure, not all candidates who have attempted petition drives have succeeded. The Indiana Green Party, for instance, has tried multiple times to qualify candidates for statewide elections, sometimes by instructing voters to download petitions and submit their signatures themselves. Those attempts failed. Under all the circumstances, however, Indiana's ballot access history supports our conclusion that the burden of satisfying the 2 percent signature requirement is not severe. *Compare Tripp*, 872 F.3d at 865 (evidence that four candidates had successfully completed petition drives in congressional elections indicated that burden was not severe), *with Lee*, 463 F.3d at 768–69 (evidence that no candidate had completed a petition drive for state legislative office since a burden was imposed indicated that it was severe).

---

[5] *See, e.g.*, R.60-13 at 2.

**2.**

We now come to the second half of the *Anderson-Burdick* analysis: an evaluation of whether the interests on which the state relies are "sufficiently weighty to justify" the burdens imposed. *Norman*, 502 U.S. at 288–89. Because the petitioning requirements do not impose "severe burdens" on the plaintiffs' rights, we need not consider whether the requirements are "narrowly tailored [to] advance a compelling state interest." *Timmons*, 520 U.S. at 358. We instead conduct a "less exacting review," under which "a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotation marks omitted).

We start with the 2 percent requirement. In *Hall*, we held that the 2 percent requirement served an important interest in avoiding the voter confusion that could result from an overcrowded ballot. 766 F.2d at 1175. Here, Indiana identifies this goal, among others, as an important regulatory interest justifying the 2 percent requirement.

The Supreme Court has recognized "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot," to "avoid confusion, deception, and even frustration of the democratic process." *Jenness*, 403 U.S. at 442. Further, by regulating the number of candidates on the ballot, "the State understandably and properly seeks to … assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections." *Bullock v. Carter*, 405 U.S. 134, 145 (1972). These interests are "sufficiently

weighty to justify" the 2 percent signature requirement. *Norman*, 502 U.S. at 288–89.

The plaintiffs submit that Indiana can protect these regulatory interests with a lower signature requirement, like the 0.5 percent requirement in effect in the state before 1980. They fault Indiana for not submitting evidence that its 2 percent signature requirement is needed to protect these interests. But there is no need for the State to "make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies" before imposing restrictions to prevent these harms. *Munro*, 479 U.S. at 194–95. State legislatures are permitted "to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Id.* at 195. "Even a 'speculative concern that altering the challenged signature requirement would lead to a large number of frivolous candidates … and, consequently, voter confusion is sufficient.'" *Stone*, 750 F.3d at 685 (7th Cir. 2014) (quoting *Navarro v. Neal*, 716 F.3d 425, 432 (7th Cir. 2013)).

The plaintiffs contend that the current signature requirement was not fashioned to serve these legitimate interests but instead was enacted for purely partisan purposes. They rely entirely upon a declaration from Mitchell Harper, a former Indiana state legislator who opposed the legislation raising the signature requirement from 0.5 percent to 2 percent. In his declaration, Harper described his experiences with this legislation from its introduction in committee to its final passage. Harper "never heard any Representative mention a regulatory interest that the legislation was intended to protect."[6] Instead, it appeared to him that the 2 percent signature

---

[6] R.60-4 at 5.

requirement was motivated solely by "political score settling" surrounding one independent candidate's achievement of ballot access in a mayoral election in 1979.[7]

This single legislator's assessment of his colleagues' intent does not undermine the constitutionality of Indiana's 2 percent signature requirement. As the Supreme Court explained in a case involving *Anderson-Burdick* balancing, "if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have provided one motivation for the votes of individual legislators." *Crawford*, 553 U.S. at 204. Harper's declaration at most indicates that "partisan interests may have provided one motivation for the votes of individual legislators." *Id.* The declaration provides no basis for disregarding the "valid neutral justifications" that support Indiana's 2 percent signature requirement. *Id.*

The other challenged elements of Indiana's petitioning process are also justified by important state interests. The June 30 filing deadline for petitions serves Indiana's interest in giving both the state and its counties sufficient time to verify the eligibility of candidates who have submitted petitions and to prepare the ballots for election day. Moreover, the requirement that petitions be submitted directly to county voter registration offices serves Indiana's interest in efficiently allocating its own resources. Some state officials need to receive the petitions and review the signatures to ensure their compliance with the statutory requirements. The legislature certainly made a reasonable determination that the counties are best suited to perform this task, because their employees are

---

[7] *Id.*

more likely to be familiar with the signers' communities, and the counties collectively have more resources to dedicate to verifying signatures. These interests are sufficient to justify the burdens imposed.

The existence of a write-in option also supports our conclusion that Indiana's requirements for candidates seeking ballot access by petition are constitutional. As the Supreme Court has recognized, this alternative means of access to the general election ballot can help free up the electoral process, to the benefit of minor parties and independent candidates. *See Storer*, 415 U.S. at 736 n.7 (noting that the existence of a write-in option can support the constitutionality of ballot access restrictions); *Jenness*, 403 U.S. at 438 (relying on fact that "Georgia freely provides for write-in votes," to uphold Georgia election scheme). *See also Hero*, 42 F.4th at 776 (relying on alternative means to access Indiana's general election ballot, including Indiana's write-in option, in concluding that restriction was not severely burdensome). We do not mean to suggest that a state could, merely by adding a write-in option, immunize itself from a challenge to a requirement that candidates seeking to get their name on the ballot obtain an excessive number of signatures. But here, Indiana's write-in option—added after we *upheld* an identical signature requirement in *Hall*, *see* Ind. Pub. L. 4-1991, § 6—eliminates any doubt we might have about the signature requirement's constitutionality.

## C.

The Libertarian Party of Indiana and the Indiana Green Party also challenge the indexing of full slate access to the results of the most recent Secretary of State election. They contend that this feature of Indiana election law "obliges them to

redirect their resources away from races for higher-profile offices that present the parties' best opportunity to grow and build support among the electorate, and toward a race for a largely administrative office that garners little attention among the electorate."[8]

The requirement that a party seeking full slate access garner 2 percent of the votes in a Secretary of State election does not impose a severe burden. To begin, a 2 percent requirement for full slate access is not that high. *See Arutunoff*, 687 F.2d at 1379 (upholding requirement that parties garner 10 percent of the votes cast in any recent gubernatorial or presidential election, to maintain full slate access); *Libertarian Party of Illinois*, 108 F.3d at 775–76 (upholding requirement that parties garner 5 percent in various elections to maintain full slate access). A party with moderate support among the electorate should, with reasonable diligence, be able to garner that many votes in one election without using all of its resources to do so.

The existence of the petitioning route as a reasonable alternative means of ballot access further supports our conclusion that the burden is not severe. When states allow parties such an alternative, the tying of full-state access to "a political organization's demonstrated support in a designated race does not 'force' the organization 'to divert its resources in any particular way.'" *SAM Party of New York v. Kosinski*, 987 F.3d 267, 275 (2d Cir. 2021) (quoting *Person v. New York State Bd. of Elections*, 467 F.3d 141, 144 (2d Cir. 2006)). Parties that do not want to use the full slate option are free to have their candidates seek access by petition. In short, the fact that "blanket access is … one of two ballot-access mechanisms" and "[t]he

---

[8] Pls.' Opening Br. 19.

alternative option of filing petitions for each candidate's candidacy" is "a reasonable means of ballot access" undercuts the plaintiffs' challenge to the full slate access mechanism. *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 575–76 (6th Cir. 2016).

The indexing of full slate access to the results of the most recent Secretary of State election furthers important state interests. The ability of a party to place its full slate of candidates on the ballot is obviously significant. Indiana might reasonably have concluded that this option should be reserved for parties with something resembling across-the-ballot support, rather than parties with only one or two viable candidates. Other circuits have fielded similar challenges to states' decisions to tie full slate access to the results of particular elections. Those circuits have generally concluded that these are the types of decisions that lie within the sound discretion of the states.[9]

## D.

The plaintiffs also urge us to reverse and remand because the district court failed to conduct the fact-sensitive analysis called for by *Anderson-Burdick*. They note that the district court did not address the burdens imposed by, and the interests served by, the county-level submission requirement and the full slate access option. They also note that the district

---

[9] *See SAM Party of New York*, 987 F.3d at 277–78 (state could condition full slate access on party's success in presidential elections); *Person*, 467 F.3d at 144 (state could condition full slate access on party's success in gubernatorial elections); *Green Party of Arkansas v. Martin*, 649 F.3d 675, 686 (8th Cir. 2011) (state could condition full slate access on party's success in gubernatorial and presidential elections).

court did not address whether Indiana's petitioning require-
ments, considered in combination, imposed a severe burden.

The plaintiffs rely primarily on two decisions in which
courts ordered remands for further consideration of the con-
stitutionality of ballot access restrictions: *Storer v. Brown* and
*Gill v. Scholz*. In *Storer*, independent candidates had only
24 days to collect signatures numbering 5 percent of the elec-
torate, and none of the signatures could be gathered from per-
sons who voted in the previous primary election. The Su-
preme Court remanded for further factfinding, because the
Court did not have before it adequate information relating to
the number of persons who did not vote in the primary elec-
tions and thus were eligible to sign the candidates' petitions.
The Court emphasized that "[d]ecision in this context, as in
others, is very much a matter of degree, very much a matter
of considering the facts and circumstances" of each case. 415
U.S. at 730 (internal citation and quotation marks omitted). In
*Gill*, independent congressional candidates needed to obtain
signatures numbering 5 percent of the electorate within
90 days. We ordered a remand for further analysis by the dis-
trict court, because the district court failed to address the
plaintiff's arguments related to the geographic size and rural
nature of his district, and it relied on inapposite ballot access
history. We stressed that courts must "conduct fact-intensive
analyses when evaluating state electoral regulations." 962
F.3d at 365.

Given decisions such as *Storer* and *Gill*, we certainly agree
with the plaintiffs that courts must pay careful attention to the
specifics of each case when evaluating the constitutionality of
ballot access restrictions. We also agree with the plaintiffs that
the district court in this case did not conduct the sort of

analysis that we and the Supreme Court have required. We cannot accept, however, the plaintiffs' submission that we remand this case to the district court. This case, unlike *Storer* and *Gill*, is not a close one. It is clear that the restrictions challenged here do not severely burden the plaintiffs' First and Fourteenth Amendment rights. Indiana's signature requirement is only 2 percent of the votes cast in a mid-term election, far lower than the 5 percent requirements at issue in *Storer*, *Jenness*, *Gill*, and the other cases we noted earlier in the opinion. Indiana allows candidates ample time to collect signatures, and the additional hurdle imposed by the county-level submission requirement is no greater than those upheld as part of more burdensome schemes. Moreover, the requirement that parties retain at least 2 percent of the vote in Secretary of State elections to maintain full slate access is reasonable in light of the petitioning alternative and the significance of the ability of a party to place its full slate of candidates on the ballot. The interests that Indiana asserts are more than sufficient to justify the burdens imposed by these restrictions.

## Conclusion

For the reasons stated in this opinion, the judgment of the district court is affirmed.

AFFIRMED