In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-2793

JOSEPH HERO,

*Plaintiff-Appellant,*

*v.*

LAKE COUNTY ELECTION BOARD,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 19-cv-00319 — **Damon R. Leichty**, *Judge.*

———————————

ARGUED APRIL 13, 2022 — DECIDED AUGUST 2, 2022

———————————

Before ROVNER, WOOD, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Joseph Hero has been a registered Republican for forty years. He supported Republican candidates, voted in Republican primaries for decades, and even ran for office as a Republican with occasional success. But local politics can be messy. Hero's town council decided to exercise its eminent-domain authority to seize property of low-income residents. Hero opposed the measure and backed independent candidates to replace two incumbent Republican

councilmembers. Upon learning of his actions, the Indiana
Republican Party banned him from the Republican party for
ten years. Undeterred, Hero tried to appear as a Republican
candidate in the 2019 election. He met all the criteria estab-
lished by Indiana law, but the party objected to his status, and
the Lake County Election Board ("the Election Board") sided
with the party, striking his name from the ballot.

Hero sued the Election Board, seeking declaratory relief
that his rights were violated in the past election and an injunc-
tion prohibiting the Election Board from similar conduct in
future elections. The district court dismissed for lack of juris-
diction. We affirm, albeit on a different basis.

## I. Background

Hero, a resident of St. John, Indiana, has been a member
of the Republican Party for more than forty years. He voted
as a Republican in every primary election since the mid-1980s,
including in the 2020 primary election; held numerous posi-
tions within the Republican Party, such as Lake County Re-
publican Chairman; supported Republican candidates for
every office; and usually voted for Republican candidates in
the general election.

In 2015, St. John got swept up in a polarizing debate over
eminent domain. The St. John Town Council, comprised ex-
clusively of five Republican members, voted to seize private
residences for a commercial development. Some residents
were unhappy because this decision would have primarily af-
fected lower-income homeowners who had been living in the
area all their lives. They formed a local political action com-
mittee to elect two independent candidates for town council
running against the incumbent, pro-development candidates.

Hero lent his support to the effort, offering legal advice, posting yard signs, and making his opinions publicly known. According to Hero, the issue was not partisan (one of the independent candidates was also a Republican), and this election was the only instance in which he openly campaigned for the defeat of a Republican candidate.

The state Republican Party, however, caught wind of Hero's efforts to oust Republican incumbents. The year after the contentious events, Hero ran to retain his position as St. John Precinct Committeeman and delegate to the Republican State Convention. The Republican Party officials determined that because he supported the independent candidates in the town-council election, he could not serve in these capacities. Shortly after, Hero received a letter from the state chairman of the Republican Party, informing him that for the next ten years he was "not a Republican in good standing" and thus barring him from seeking elected office in Indiana as a Republican during that time. Undeterred by the letter, in 2019, Hero declared his candidacy for an at-large seat on the St. John Town Council.

Under Indiana law, there are three ways to appear on an election ballot. First, a candidate of a major political party can file a "declaration of candidacy" for a party if either he voted in the last primary election, or the county chairman certifies that the candidate is a member of the political party. Ind. Code § 3-8-2-7(a)(4) (2021). Second, a candidate can run as an independent by obtaining two percent of the total vote cast in the last election. *Id.* § 3-8-6-3(a). Third, a candidate can appear as a write-in option. *Id.* § 3-8-2-2.5(a).

Despite meeting the requirements to appear on the Republican primary ballot in 2019, the chairman of the Lake County

Republican Party and a member of the Lake County Council challenged Hero's candidacy. The Lake County Election Board held a hearing on February 26, 2019. Hero explained that he met the requirements under Indiana law to be a Republican in the upcoming primary election. He presented an opinion from an attorney for the Indiana Election Division and a print-out of every Republican primary he had voted in since the mid-1980s. The challengers conceded that Hero met the qualifications for affiliation under Indiana Code § 3-8-2-7(a)(4) but maintained that Hero could not run based on "an actual order from the party chairman in Indiana." The Election Board unanimously ruled against Hero and removed his name from the Republican primary ballot.

Hero filed a complaint against the Election Board in federal court, arguing that "[t]he determination that the plaintiff may not run for election as a member of the Republican Party, and the resulting removal of the plaintiff from the Republican primary ballot, violates the First and Fourteenth Amendments of the United States Constitution." *See* 42 U.S.C. § 1983. He requested declaratory relief that the Election Board "violated the rights of the plaintiff" and an injunction "prohibiting the [Election Board] from prohibiting the plaintiff from seeking election as a member of the Republican primary provided that he meets all requirements of Indiana Code § 3-8-2-7," though not damages. He submits that he would like to run as a Republican candidate "for the St. John Town Council or another local office at the earliest opportunity" and the Election Board's position effectively denied him the chance to run for the duration of the ten-year ban.

Both parties moved for summary judgment, and the district court dismissed the appeal for lack of standing. The 2019

election "has been held and decided," and there were no "continuing, present adverse effects" of the past illegal conduct.

## II. Discussion

On appeal, Hero argues he has standing to sue and should prevail on the merits of his claim. We review the district court's grant of summary judgment de novo, construing all facts and drawing all reasonable inferences in favor of the nonmoving party's favor. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022).

### A. Article III Jurisdiction

We first address our jurisdiction. The Election Board claims that Hero lacks Article III standing and, in the alternative, his claims for relief are moot. In his complaint, Hero sought a declaratory judgment for a past alleged wrong—his ballot-access denial from the Republican primary in 2019—and an injunction for a future wrong—the potential deprivation of his alleged right to appear on the ballot for the 2023 Republican primary. Although a plaintiff must have standing for each requested relief, *see California v. Texas*, 141 S. Ct. 2104, 2115 (2021), we focus on the declaratory judgment because Hero has satisfied the requirements under Article III.[1]

---

[1] Hero's claim for an injunction is more problematic. A plaintiff seeking "prospective relief against a harm not yet suffered … must establish that he 'is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and [that] the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical.'" *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)); *see also Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 393–94 (7th Cir. 2019). A plaintiff, like Hero, alleging some

### 1. Standing

Article III grants federal courts jurisdiction over "cases" and "controversies." U.S. Const. art. III § 2. "One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Standing has three elements: a plaintiff must have suffered (1) a concrete and particularized injury that is actual or imminent, (2) traceable to the defendant's conduct, and (3) can be redressed by judicial relief. *Pierre v. Midland Credit Mgmt., Inc.*, 29 F.4th 934, 937 (7th Cir. 2022); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The Election Board does not contest that Hero has satisfied most of the standing requirements—he suffered a concrete and particularized injury, caused by the Election Board, that could be remedied by his requested relief. The Election Board maintains, however, that neither of Hero's requested remedies satisfy the "actual or imminent" requirement of injury-in-fact. We disagree.

The claim for declaratory judgment easily meets the "actual" injury requirement of standing. Hero requested relief for a past wrong—mainly, the Election Board's decision to strike his name from the Republican Party's primary ballot for the 2019 election. A routine past harm, such as denial of access to a ballot, presents a textbook example an "actual" injury suffered. *See, e.g., Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944, 947 (7th Cir. 2019).

---

"criminal or unconstitutional behavior" based on official conduct that has yet to transpire faces a steep climb. *Bell*, 697 F.3d at 451.

### 2. Mootness

While Hero has standing to seek a declaratory judgment, we still must consider mootness. An actual controversy must exist at every phase of litigation. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016). If later events resolve the dispute, then the case is moot. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71–72 (2013). Both parties acknowledge that the request for declaratory relief fits within this definition because the 2019 election has come and gone. Hero argues though that his case is not moot because it falls within the "capable of repetition, yet evading review" exception, which permits courts to hear cases after resolution because the injuries occur too quickly for judicial review during the normal process. "The exception applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).

Hero's claim for a declaratory judgment falls within the "capable of repetition, yet evading review" exception. "Challenges to election laws [or election-board decisions] are one of the quintessential categories of cases which usually fit" within the evading-review "prong because litigation has only a few months before the remedy sought is rendered impossible by the occurrence of the relevant election." *Graveline v. Benson*, 992 F.3d 524, 533 (6th Cir. 2021) (quoting *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005)); *see also Gaspee Project v. Mederos*, 13 F.4th 79, 84 (1st Cir. 2021); *Acevedo*, 925 F.3d at 947. Elections often happen too quickly for meaningful judicial review to occur before a dispute is resolved, as many cases take years

to reach a final disposition. Absent this exception, few challenges would be heard outside of an emergency basis. The facts here offer an illustrative example. Hero declared his candidacy in early 2019, and the Election Board heard his challenge in late February 2019. Hero filed his complaint shortly thereafter, in August 2019, and a final resolution will come, at the earliest, three years later. A three-year timeline is certainly not sufficient to litigate this difficult case before it becomes moot.[2]

Hero also will reasonably run again "at the earliest opportunity." He declared his intention to do so and has a long history of running for office. The ten-year ban is still in effect, and neither the Indiana Republican Party nor the Election Board have shown any intention to change course.

Recent Supreme Court decisions advise that routine election-law cases, such as this one, typically remain justiciable after the election has passed. In *Federal Election Commission v. Wisconsin Right to Life, Inc.*, for example, the Court unanimously held that a challenge to the Federal Election Commission's blackout period for ads prior to an election was not moot. 551 U.S. at 462. Despite a two-year challenge window, the case would still avoid judicial review because groups

---

[2] The Election Board averred for the first time at oral argument that Indiana state law, by providing some process to challenge the law, satisfied the "evading review" prong of the mootness exception. Assuming with skepticism that a state-court procedure might adequately provide the necessary review contemplated by federal law, a proposition that no other circuit court has recognized, the Election Board has failed to provide any details to support its argument. When pressed, it could not even say conclusively whether a decision would be rendered by a state court in time for an election.

might not know what ads to air until the public concern arises. *Id.* at 462–63. Nor does there need to be any type of precisely similar fact pattern. *Id.* at 463. "Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges." *Id.* One year later, the Court reaffirmed this holding in *Davis v. Federal Election Commission*. 554 U.S. 724 (2018). A group sought to run an ad within thirty days of the Wisconsin primary, and the Court again held that it was not moot because the case "closely resemble[d]" *Wisconsin Right to Life*. *Id.* at 735.

Our opinion in *Gill v. Scholz*, 962 F.3d 360 (7th Cir. 2020), parallels this case. There, David Gill wanted to run as an independent candidate for an Illinois election, but he came up 2,000 votes shy of the number necessary to appear on the general ballot. *Id.* at 361. He and several registered voters sued the election board for a violation of the First and Fourteenth Amendments. *Id.* at 362. The district court granted summary judgment to the board, and Gill appealed. *Id.* Despite finding the appeal of the stay was moot, we determined that his case fit within the "capable of repetition, yet evading review" exception because "Gill was unable to litigate his claim before the November 2016 election was held, and he has expressed his intent to run for office in 2020." *Id.* at 363 n.3. Here too, Hero could not litigate his claim before the election on appeal, and he has declared his intent to run again. *See also Acevedo*, 925 F.3d at 947–48 ("[T]he timeline for collecting signatures to appear on a primary ballot is too short to fully litigate a challenge to the signature requirement. In light of this, and because Acevedo has expressed his intention to run for office in Cook County again, his challenge remains live.").

Other circuits have reached the same conclusion in similar election-law disputes. *See, e.g., Gaspee Project*, 13 F.4th at 84; *Nat. Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 692 (2d Cir. 2013); *Stop Reckless Econ. Stability Caused by Democrats v. Fed. Election Comm'n*, 814 F.3d 221, 231 (4th Cir. 2016); *Cath. Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014); *Graveline v. Benson*, 992 F.3d 524, 533 (6th Cir. 2021); *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003).

The Election Board relies upon *Tobin for Governor v. Illinois State Board of Elections*, 268 F.3d 517 (7th Cir. 2001). In *Tobin*, the plaintiffs were Illinois residents who wished to place candidates from the Libertarian Party on the general election ballot. *Id.* at 519. A group also formed a political committee, named Tobin for Governor, to support James L. Tobin for governor of Illinois. *Id.* The party gathered signatures for its nomination petition, but the Illinois State Board of Elections struck out so many that the petition fell below the necessary threshold. *Id.* The Libertarian candidates who did not appear on the ballot first filed suit in Illinois state court; the state trial court determined that the Libertarian Party needed to be named, and the candidates did not serve the objectors or the party with the necessary petition for judicial review under Illinois law. *Id.* The circuit court dismissed the action, the state intermediate appellate court affirmed, and the Illinois Supreme Court denied the appeal. *Id.* The plaintiffs then sued the board in federal court. *Id.* We concluded that the party's case did not fall within the "capable of repetition, yet evading review" exception because "a controversy of this sort does not necessarily evade review." *Id.* at 529. The plaintiffs made several "procedural missteps that prevented judicial review of the Board's decision." *Id.* Additionally, there was no "reasonable

expectation that Tobin for Governor [would] find itself in this same situation in the future." *Id.*

Ultimately, *Tobin* is distinguishable for three reasons. First, Hero never pursued a state remedy and thus never committed the various "procedural missteps" made by the Libertarian candidates. Second, Hero has shown a "reasonable expectation" to run for office again; he has declared his intention and provided ample support to corroborate his plan. Finally, Hero advances a different type of claim than the one in *Tobin*. He alleges the state denied him complete ballot access, which differs in kind from a failure to collect a certain number of ballot signatures. A signature-collection issue lends itself to state resolution because of the difficulties in verifying the individual signatures and the complex procedural vehicles to adjudicate disputes, whereas a ballot-access claim often involves agreed-upon facts and isolated legal issues.

## B. Federal Question

The Election Board raises a challenge, for the first time on appeal, to our statutory jurisdiction. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("Subject-matter jurisdiction can never be waived or forfeited. The objections may be resurrected at any point in the litigation …."). Section 1331 gives district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The well-pleaded rule requires that a federal question be "apparent on the face" of the complaint. *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 890 (7th Cir. 2013) (citing *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)). A federal statute that creates a "cause of action" raises a "federal question." *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10*, 966 F.3d

661, 673 (7th Cir. 2020). Hero's well-pleaded complaint raises a "federal question" by alleging a deprivation of his First and Fourteenth Amendment rights. *See* 42 U.S.C. § 1983. Section 1983 provides a cause of action, which suffices to grant federal-question jurisdiction in this case.

## C. Election Law

We turn now to the merits.[3] The First and Fourteenth Amendments safeguard the rights of citizens and political parties to participate in the electoral system. *See Norman v. Reed*, 502 U.S. 279, 288 (1992). "We have stated that the *Anderson/Burdick* 'test applies to *all* First and Fourteenth Amendment challenges to state election laws.'" *Tully v. Okeson*, 977 F.3d 608, 615 (7th Cir. 2020) (quoting *Acevedo*, 925 F.3d at 948). The *Anderson-Burdick* framework derives from two Supreme Court cases, *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). In *Anderson*, the Court struck down as unlawful Ohio's early filing deadline, which required independent candidates to file a statement of candidacy in March ahead of the November election. 460 U.S. at 786–87. The law placed too great a restriction on the associational rights of independent voters. *Id.* at 790–92. In *Burdick*, however, the Court upheld a Hawaii law that prohibited

---

[3] Although the district court did not consider the merits, "we may affirm on any ground supported in the record so long as it was adequately addressed below and the plaintiffs had an opportunity to contest the issue." *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). Hero sued the state Election Board for violating his First and Fourteenth Amendments rights. Both parties accept these amendments govern. We do not necessarily share this confidence but given the clear resolution of this dispute and the possibility of waiver, we assume that Hero states a plausible claim for relief.

write-in voting under a more flexible standard. 504 U.S. at
432–33. The law imposed a low burden, and Hawaii had an
interest in avoiding unrestrained factionalism. *Id.* at 433–40.

The resulting test requires courts to engage in a two-part
inquiry:

> First, we determine whether the law imposes severe or
> reasonable and nondiscriminatory restrictions on can-
> didates' and voters' constitutional rights so that we can
> ensure application of the appropriate level of scrutiny.
> Second, we must determine whether the state interest
> offered in support of the law is sufficiently weighty un-
> der the appropriate level of scrutiny.

*Navarro v. Neal*, 716 F.3d 425, 430 (7th Cir. 2013) (internal cita-
tion omitted). Severe restrictions on voter rights trigger strict
scrutiny, whereas courts generally defer to the state's interest
for less restrictive ones, those that impose "reasonable, non-
discriminatory restrictions." *Id*. (quoting *Burdick*, 504 U.S. at
434).

The Election Board did not violate Hero's First and Four-
teenth Amendment rights. The decision to strike Hero's name
from the ballot imposed only a minor restriction on his ballot
access. Indiana law provides alternative means to access the
general-election ballot. Although Hero cannot run in the Re-
publican primary—undoubtedly his first choice—he can ei-
ther run as an independent by obtaining two percent of the
total vote cast in the last election or as a write-in candidate.
Ind. Code §§ 3-8-2-2.5(a), 3-8-6-3(a). As an independent, he
can tout his Republican virtues, tell voters he supports Repub-
licans, put up yard signs to that effect, and run on a platform

identical to any political party. The only limitation is that he cannot appear on the Republican Party's primary ballot.

The restriction here is also reasonable and nondiscriminatory. The state has an interest in protecting a party's right to determine its own membership and limit its candidates to those party members. *Cf. Ray v. Blair*, 343 U.S. 214 (1952) (party loyalty oath); *Kucinich v. Tex. Democratic Party*, 563 F.3d 161 (5th Cir. 2009) (party loyalty oath); *Da La Fuente v. Cortes*, 751 F. App'x 269 (3d Cir. 2018) (sore-loser law); *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752 (4th Cir. 2010) (sore-loser law). Implicit in the First Amendment is the freedom "to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Id.* at 648. Political parties enjoy these associational rights like any other organization. And "[i]n no area is the political association's right to exclude more important than in the process of selecting its nominee." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 575 (2000); *see also Maslow v. Bd. of Election in N.Y.C.*, 658 F.3d 291, 296 (2d Cir. 2011) ("The Supreme Court has emphasized—with increasing firmness—that the First Amendment guarantees a political party great leeway in governing its own affairs.").

Hero seeks to use the First Amendment as a sword, demanding "a certain degree of influence in[] the party." *N.Y. State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008).

But his bold assertion finds little support in precedent. Including people unaffiliated with the party—or those with whom the party does not wish to affiliate—"may seriously distort [the party's] collective decisions—thus impairing the party's essential functions." *Democratic Party of U.S. v. Wisc. ex rel. La Follette*, 450 U.S. 107, 122 (1981). "[P]olitical parties may accordingly protect themselves 'from intrusion by those with adverse political principles," *id.* (quoting *Ray*, 343 U.S. at 221–22), so too can a state protect the First Amendment rights of a political party, as the Election Board did here by allowing the Republican Party to determine its own membership and restrict its standard bearers to members in good standing.

Our conclusion aligns with two Eleventh Circuit opinions regarding a party's effort to exclude a candidate, David Duke, from its primary ballot. *Duke v. Massey*, 87 F.3d 1226 (11th Cir. 1996); *Duke v. Cleland*, 954 F.2d 1526 (11th Cir. 1992).[4] The cases involve essentially identical facts. Georgia law established a committee to select the candidates for the presidential primary ballot. *Cleland*, 954 F.2d at 1527. Duke met the criteria, yet the Republican committee members successfully removed his name from the ballot. As a result, Duke and two

---

[4] *See also De La Fuente v. Simon*, 940 N.W.2d 477, 496 (Minn. 2020) ("[T]he statute poses no bar to De La Fuente's right to be a presidential candidate on the general election ballot, as a party's nominee or a write-in candidate. … In contrast to this de minimis burden, the associational rights of political parties to choose a candidate are well-established."); *Langone v. Sec'y of Com.*, 446 N.E.2d 43, 50 (Mass. 1983) ("To the extent, however, that the plaintiffs wish to associate and express their ideas as Democrats, those ideas may be represented by the several candidates who obtained the requisite convention support. Every voter cannot be assured that a candidate to his liking will be on the ballot.").

supporters sued the Secretary of State and Committee (not the Georgia Republican Party). *Id.* at 1527–28. Twice, the Eleventh Circuit sided with the state. In the first case, the court agreed that the committee's action infringed upon Duke and his supporters' right to associate and vote. *Id.* at 1533. But Georgia "has an interest in maintaining the autonomy of political parties," which means the Republican Party "enjoys a constitutionally protected right of freedom of association." *Id.* at 1531–32. Applying the "reasonable restriction" standard, the decision to exclude Duke easily passed muster. Four years later, the Eleventh Circuit again denied Duke his requested relief, this time under strict scrutiny because the "state has a compelling interest in protecting political parties' right to define their membership." *Massey*, 87 F.3d at 1234. Both times, the interests of the party prevailed over that of a single candidate attempting to dictate an organization's speech. While Hero is by no means advocating similar beliefs as Duke, he also cannot define the Republican Party's message.

### III. Conclusion

For these reasons, we affirm the judgment of the district court.